**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| VANHPHENH S., | |
| Claimant, | |
| v. | No. 18 CV 6121 |
| ANDREW SAUL, Commissioner of Social Security, | Magistrate Judge Jeffrey T. Gilbert |
| Respondent. | |

**MEMORANDUM OPINION AND ORDER**

Claimant Vanhphenh S.[1] ("Claimant") seeks review of the final decision of Respondent Andrew Saul,[2] Commissioner of Social Security ("Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [ECF No. 8]. The parties have filed cross-motions for summary judgment [ECF Nos. 18, 25] pursuant to Federal Rule of Civil Procedure 56. This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c). For the reasons discussed below, Claimant's Motion for Summary Judgment [ECF No. 18] is denied and the Commissioner's Motion [ECF No. 25] is granted.

---

[1] Pursuant to Northern District of Illinois Local Rule 8.1 and Internal Operating Procedure 22, the Court will identify the non-government party by using his or her full first name and the first initial of the last name.

[2] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019. Pursuant to Federal Rule of Civil Procedure 25(d), the Court has substituted Commissioner Saul as the named defendant.

## PROCEDURAL HISTORY

On August 13, 2014, Claimant filed a Title II application for DIB alleging disability beginning on June 1, 2008.[3] (R. 298-99). Her claim was denied initially and upon reconsideration, after which Claimant requested a hearing before an Administrative Law Judge ("ALJ") and amended her alleged disability onset date to June 14, 2013. (R. 45-46, 206-07). On April 11, 2017, Claimant appeared and testified at a hearing before ALJ Roxanne J. Kelsey. (R. 39-111). ALJ Kelsey also heard testimony on that date from vocational expert ("VE") Aimee Mowery and former Asian Human Services worker Song San. (R. 39-111). On September 28, 2017, ALJ Kelsey denied Claimant's claim for DIB. (R. 20-32).

In finding Claimant not disabled, the ALJ followed the five-step evaluation process required by Social Security regulations for individuals over the age of 18. See 20 C.F.R. § 416.920(a). At step one, the ALJ found that Claimant did not engage in substantial gainful activity during the relevant period from June 14, 2013 through her date last insured of December 31, 2015. (R. 22). At step two, the ALJ found that Claimant had a severe impairment or combination of impairments as defined by 20 C.F.R. 404.1520(c) and 416.920(c). (R. 22-23). Specifically, Claimant suffered from headaches, a history of a contusion to her head and shoulders, anxiety, and depression. (R. 22-23). These severe impairments, according to the ALJ, "significantly limit [Claimant's] physical or mental ability to do basic work activities and have lasted or are expected to last at least twelve continuous months." (R. 22). The ALJ also acknowledged several non-severe complaints – carpal tunnel syndrome, hypertension, high cholesterol, dizziness, and a sinus infection – but concluded they did not cause work-related limitations. (R. 22-23).

---

[3] Claimant had previously filed an application for DIB on June 27, 2011 alleging disability beginning on June 1, 2008. This application was denied at every stage and memorialized in an opinion by a different administrative law judge on June 13, 2013. (R. 153-58).

At step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 23-24). The ALJ first noted that Claimant did not meet or medically equal the criteria of listing 11.00, as there was no evidence of a sensory or motor disorder. Nor did she meet listing 11.04, according to the ALJ, because there was no ongoing evidence of sensory or motor aphasia resulting in ineffective speech or communication or significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements or gait and station. (R. 23).

In her listing level analysis, the ALJ also disagreed with Claimant's suggestion that she met or medically equaled listings 12.04A, 12.04C, 12.06A, and 12.06C. (R. 23). The ALJ evaluated whether Claimant satisfied the "paragraph B" criteria and found Claimant had moderate limitations in all four functional areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (R. 23-24). However, because Claimant's mental limitations did not cause at least two "marked" limitations or one "extreme" limitation, and because the "paragraph C" criteria also were not satisfied, the ALJ concluded that Claimant did not meet or medically equal the criteria of listings 12.04 or 12.06. (R. 23-25).

The ALJ then found Claimant had the RFC,[4] through her date last insured, to:

"perform medium work as defined in 20 CFR 404.1567(c) except with no more than occasional exposure to concentrated levels of vibrations or noise. Claimant lacks the ability to understand, remember and carry out detailed instructions because of moderate limitations in concentration, but retains the sustained concentration necessary for simple work of a routine type if given normal workplace breaks, meaning two 15 minute breaks after two hours of work and a 30 minute break mid-shift. Claimant may occasionally work in coordination with or proximity to others. Claimant would be unable to maintain

---

[4] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite [her] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

assembly line or production pace employment because of moderate limitations in pace, but maintains the ability to perform work permitting a more flexible pace. Because of moderate difficulties interacting with others, claimant may only engage in brief and superficial contact with the general public. Claimant should experience no more than occasional changes in the work setting." (R. 25).

Based on this RFC, the ALJ found at step four that Claimant had past relevant work as a packager and soderer but that she was unable to perform this work. (R. 30). The packaging job, the ALJ explained, did not meet Claimant's pace requirements, nor did the soderer job meet Claimant's noise requirements. (R. 30). At step five, the ALJ concluded that, considering Claimant's age, education, past work experience, and residual functional capacity, she is capable of performing other work within the national economy and that those jobs exist in significant numbers. (R. 30-31). Specifically, the VE's testimony, on which the ALJ relied, identified jobs including inspector, laboratory cleaner, and sorter as those that would be available to Claimant in significant numbers. (R. 31). The ALJ then found Claimant was not disabled under the Act. (R. 31-32). The Appeals Council declined to review the matter on July 6, 2018, (R. 1-3), making the ALJ's decision the final decision of the Commissioner and, therefore, reviewable by this Court. 42 U.S.C. § 405(g); *see, e.g., Smith v. Berryhill,* 139 S. Ct. 1765, 1775 (2019); *Haynes v. Barnhart,* 416 F.3d 621, 626 (7th Cir. 2005).

## STANDARD OF REVIEW

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Judicial review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his or her decision. *See Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). The reviewing court may enter a judgment "affirming,

modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted); *see also, Richardson v. Perales*, 402 U.S. 389, 401 (1971). While it is not a high threshold, *Fanta v. Saul*, 2021 WL 961647, at *2 (7th Cir. 2021), a "mere scintilla" of evidence is not enough. *Biestek,* 139 S. Ct. at 1154; *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even where there is adequate evidence in the record to support the decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (internal quotations omitted). In other words, if the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008) (internal quotations omitted). The reviewing court may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## ANALYSIS

### I.      The VE's Testimony and the DOT

Claimant first argues that the ALJ violated Social Security Ruling ("SSR") 00–4p, which imposes a two-fold responsibility on the ALJ if he or she intends to rely on testimony from a VE about the requirements of a particular job. First, the ALJ must specifically ask the VE about any possible conflicts between the VE's testimony and the Dictionary of Occupational Titles ("DOT").

Second, if there is an apparent conflict, the ALJ must obtain a reasonable explanation from the VE for that conflict. SSR 00–4p; *Mitchell v. Berryhill*, 2019 WL 426149 (N.D. Ill. 2019); *Overman v. Astrue,* 546 F.3d 456, 463 (7th Cir. 2008); *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006). For a conflict to be "apparent," it must be "so obvious that the ALJ should have picked up on it without any assistance." *Terry v. Astrue,* 580 F.3d 471, 478 (7th Cir. 2009); *Overman*, 546 F.3d at 463–64.

Claimant asserts that the ALJ failed in both respects here. First, Claimant states that the ALJ erred by asking the VE before her testimony, rather than after, whether she understood she must inform the ALJ of any conflicts between her testimony and the DOT and, in the event of a conflict, that she must provide the basis of her opinion. Second, Claimant argues that the ALJ failed to identify discrepancies between the VE's testimony and the DOT definitions that were so obvious that they triggered the ALJ's duty to investigate the conflict and obtain an explanation from the VE. For the reasons discussed below, the Court finds no remand is required on either point.

Turning to the ALJ's responsibility to ask the VE about any possible conflicts between her testimony and the DOT, the ALJ began her examination of the VE in this case as follows:

> "Q: Are you familiar with the job information contained in the Dictionary of Occupational Titles?
> A: Yes.
> Q: Do you understand that if you give us an opinion which conflicts with this information that you need to advise us of the [conflict] and the basis for your opinion?
> A. Yes."

(R. 87-88).

This inquiry fulfilled the ALJ's first duty under SSR 00-4p, which asks only that the ALJ inquire about conflicts before *relying* on a VE's testimony and contains no other temporal requirement. SSR 00–4p. Although Claimant urges this Court to read SSR 00-4p as requiring the

ALJ to wait until the end of the VE's testimony to ask about potential conflicts with the DOT, the Seventh Circuit has explicitly rejected this interpretation. *Weatherbee v. Astrue*, 649 F.3d 565, 570 (7th Cir. 2011) ("We reject Weatherbee's claim that Ruling 00–4p requires ALJs to inquire about conflicts between a VE's testimony and the DOT after the VE provides her substantive testimony… we have not read a temporal requirement into the Ruling 00–4p and have refused to establish a singular method by which ALJs must elicit potential conflicts."). This Court is in accord, as are other courts in this district. *See also, Howze v. Astrue,* 2010 WL 3075524, at *1–2 (N.D. Ill. 2010); *Harris v. Astrue,* 646 F. Supp. 2d 979, 995 (N.D. Ill. 2009). It is therefore enough in this case that ALJ asked the VE about possible conflicting testimony; that the VE agreed, under oath, to identify and resolve any conflict between her testimony and the DOT; and that the record gives the Court no reason to believe the VE did not understand or conform to that agreement.

Moving to SSR 00-4p's second requirement, the Court must determine whether the VE's testimony in fact conflicted with the DOT in this case. *See, e.g., Minett v. Colvin,* 2015 WL 7776560 (N.D. Ill. 2015). If there is no conflict, there is "no requirement for the ALJ to ask further questions." *Id.* at *8. The VE testified here that if Claimant was restricted to medium work and the limitations outlined in the RFC, she could work as an inspector, laboratory cleaner, or ball sorter. (R. 101-102). All three of these jobs have a General Educational Development[5] ("GED") reasoning level of two, which refers to the application of "commonsense understanding to carry out detailed but uninvolved written or oral instructions" and dealing with "problems involving a few concrete variables in or from standardized situations." DOT, App'x C, § III. This is in conflict, Claimant

---

[5] The DOT provides detailed physical requirements for a variety of jobs. The Social Security Administration has taken "administrative notice" of the DOT, 20 C.F.R. § 416.966(d)(1), and each occupation listed in the DOT is assigned, on a scale from 1 to 6, a "reasoning development" level. This reasoning level is but one component of what the DOT calls the "General Educational Development" scale. See DOT, App'x C, § III; *Tincher v. Berryhill,* 2018 WL 472447, at *6 (N.D. Ill. 2018).

says, with an RFC assessment stating that "[C]laimant lacks the ability understand, remember and carry out detailed instructions because of moderate limitations in concentration, but retains the sustained concentration necessary for simple work of a routine type if given normal workplace breaks, meaning two 15 minute breaks after two hours of work and a 30 minute break mid-shift." (R. 25).

The Court disagrees that the assigned reasoning level of 2 for inspector, laboratory cleaner, or ball sorter jobs inherently conflicts with the ALJ's RFC assessment here. "[T]he Social Security regulations and the DOT use markedly different standards for addressing a claimant's ability to understand, remember, and concentrate on job duties." *Thompkins v. Astrue*, 2010 WL 5071193, at *10 (N.D. Ill. 2010); *see also Givens v. Colvin,* 551 F. App'x 855, 863 (7th Cir. 2013) (explaining that a GED level, which includes a reasoning revel, "focus[es] on the worker's educational background, not on on-the-job requirements"). As the court in *Meissl v. Barnhart*, 403 F. Supp. 2d 981 (C.D. Cal. 2005), explained during an in-depth look at this issue:

> "The Social Security regulations separate a claimant's ability to understand and remember things and to concentrate into just two categories: "short and simple instructions" and "detailed" or "complex" instructions. 20 C.F.R. § 416.969a(c)(1)(iii); see also 20 C.F.R. part 404, subpart P, Appendix 1, Listing 12.00C(3) ("You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks"). The DOT, on the other hand, employs a much more graduated, measured and finely tuned scale starting from the most mundane ("simple one- or two-step instructions" at level one), moving up to the most complex ("applying principles of logical or scientific thinking ... apprehend the most abstruse classes of concepts" at level six). DOT at 1010–1011. To equate the Social Security regulations['] use of the term "simple" with its use in the DOT would necessarily mean that all jobs with a reasoning level of two or higher are encapsulated within the regulations' use of the word "detail." Such a "blunderbuss" approach is not in keeping with the finely calibrated nature in which the DOT measures a job's simplicity.

*Meissl*, 403 F. Supp. 2d at 984.

So, "no one-to-one parallel can be found between 'simple' as it [is] used under the regulations and the DOT's requirements; a task may be 'simple' under the regulations and still

8

involve the kind of 'detailed' tasks required under Level 2 reasoning." *Thompkins*, 2010 WL 5071193, at *10; *see also, Masek v. Astrue*, 2010 WL 1050293 (N.D. Ill. 2010). It follows, therefore, that no parallel can be found between "detailed" as it is used under the regulations and "detailed but uninvolved" as described in the DOT – especially given that the DOT specifically limits its reasoning level 2 instructions to "uninvolved" matters. The addition of the qualifier of "uninvolved," other courts have reasoned, "downplays the rigors of Level 2 instructions and brings them in line with an ALJ's limitation of job duties to 'simple' tasks." *Thompkins,* 2010 WL 5071193, at *10-11 (citing *Meissl*, 403 F. Supp. 2d at 984). The Court is persuaded by this reasoning – in particular, by the courts in *Meissl, Masek,* and *Thompson* – and it therefore rejects Claimant's argument that the mere fact that the word "detailed" appears in both Claimant's RFC and the DOT creates a conflict. To find otherwise would be to adopt a strictly literal approach inconsistent with the majority view in this circuit and the "finely calibrated nature" of the DOT. *Meissl*, 403 F. Supp. 2d at 984; *Masek,* 2010 WL 1050293, at *22.

In fact, this Court has previously addressed whether simple, routine work restrictions, such as those imposed on Claimant here, are necessarily inconsistent with reasoning level 2 occupations and concluded that they are not. *Mitchell*, 2019 WL 426149, at *4 (citing *Minett*, 2015 WL 7776560, at *8 ("In this Circuit, many courts have found that a limitation to simple, routine tasks is not inconsistent with level two reasoning."); *Stile v. Colvin*, 2017 WL 2908783, at *7–8 (N.D. Ill. 2017) (following simple instructions and making simple decisions is not inconsistent with Reasoning Level 2); *Thompkins*, 2010 WL 5071193, at *5, *10–11 (finding RFC restriction to "simple, routine, repetitive tasks which require little judgment or decision-making" not inconsistent with Reasoning Level 2)); *see also, Hackett v. Barnhart,* 395 F.3d 1168, 1176 (10th Cir. 2005) (Level 2 reasoning is consistent with an RFC of simple, routine tasks); *Money v.*

*Barnhart*, 91 F. App'x 210, 214 (3d Cir. 2004); *Flaherty v. Halter*, 182 F. Supp. 2d 824, 850–51 (D. Minn. 2001).

The Seventh Circuit has even concluded "simple" work restrictions do not necessarily preclude someone from performing jobs at a higher reasoning level of 3. *Terry*, 580 F.3d at 480 (a capacity to follow simple instructions was not inconsistent with reasoning level 3); *Sawyer v. Colvin*, 512 F. App'x 603, 610–11 (7th Cir. 2013) (finding no conflict between a "simple tasks" restriction and reasoning level 3 and noting that "even workers who are markedly limited in their ability to understand, remember, and follow detailed instructions might still be able to perform jobs requiring level 3 reasoning development"). In light of these cases, as well as Claimant's failure in this case to cite any persuasive legal authority in support of her position to the contrary,[6] the reasoning levels of the identified jobs alone do not make them inconsistent with the RFC's simple work-related restrictions.

Claimant insists that the conflict here arises not from the restriction to "simple, routine" work, but from Claimant's "inability to understand, remember or carry out detailed instructions." [ECF No. 27] at 3. The ALJ, however, restricted Claimant to "simple work of a routine type" with "normal workplace breaks" specifically to accommodate the fact that Claimant "lacks the ability to understand, remember and carry out detailed instructions." (R. 25). Both restrictions describe or accommodate Claimant's mental limitations as they pertain to her concentration, and neither causes a conflict between the VE's testimony and the DOT. Further, while the ALJ concluded that

---

[6] Claimant cites *to Schlattman v. Colvin*, 2014 WL 185009, *6 (N.D. Ill. 2014) for the proposition that "[t]his Court has previously ruled that 'simple one and two step tasks at a consistent pace' is inconsistent with GED reasoning level two jobs." But the court in that case specifically explained that there is a "significant difference between one- to two-step tasks and simple, routine, repetitive tasks." *Id.* at *7. This case involves the latter. Therefore, to the extent *Schlattman* held that simple "one and two step tasks" were inconsistent with reasoning level two jobs, such a holding is largely irrelevant to a limitation to "simple, routine, and repetitive tasks."

Claimant had "moderate limitations" in concentration, persistence, or pace, (R. 24), it is not obvious from the evidence before the ALJ that Claimant would be unable to perform tasks requiring a reasoning level of 2. Nor does Claimant offer any evidence in either her memorandum or reply that explains why she is in fact precluded from performing such tasks.

As is evident from the above discussion, the existence of an actual conflict in this case is far from certain. Yet even if the Court were to find a conflict does exist, Claimant did not object at the hearing and must therefore show that the conflict was "obvious enough that the ALJ should have picked up on [it] without any assistance." *Overman*, 546 F.3d at 463. That is not the case here: the conflict between the ALJ's understanding of Claimant's cognitive limitations and the level of complexity involved in jobs with a reasoning level 2, if there is a conflict, was not "obvious." Although the ALJ concluded Claimant could not understand, remember, and carry out detailed instructions, the record evidence supported the ALJ's secondary conclusion that Claimant could concentrate well enough to perform simple, routine work with normal workplace breaks. (R. 24). Specifically, Dr. Divyang Joshi and Dr. Bindu Gandhiraj – Claimant's primary care physician and treating psychiatrist, respectively –characterized Claimant's concentration as "fair" or "fine." (R. 507, 620-21, 819). Dr. Gandhiraj also consistently described Claimant's recent and remote memory, as well as her insight and judgment, as good and repeatedly noted that she had clear thought processes that were "logical and goal directed." (R. 508, 521, 530, 555, 568, 573, 576, 579). All these medical evaluations and conclusions, the ALJ noted, suggested at least the ability to remember and apply simple, routine instructions in a workplace setting, as well as the ability to concentrate on simple, routine tasks under the parameters described in the RFC. (R. 23-24, 27-29).

Therefore, because the alleged conflict was not apparent and "no one question[ed] the vocational expert's foundation or reasoning, [the] ALJ [was] entitled to accept the vocational

expert's conclusion, even if that conclusion differs from the Dictionary's—for the Dictionary, after all, just records other unexplained conclusions and is not even subject to cross-examination." *Donahue v. Barnhart,* 279 F.3d 441, 446 (7th Cir. 2002). The Court finds no reversible error in the VE's testimony as alleged by Claimant here, nor in the ALJ's reliance upon it.

## II.     The ALJ's RFC Determination

At step four, the ALJ determined that Claimant, despite her limitations, had the RFC to:

> "perform medium work as defined in 20 CFR 404.1567(c) except with no more than occasional exposure to concentrated levels of vibrations or noise. Claimant lacks the ability to understand, remember and carry out detailed instructions because of moderate limitations in concentration, but retains the sustained concentration necessary for simple work of a routine type if given normal workplace breaks, meaning two 15 minute breaks after two hours of work and a 30 minute break mid-shift. Claimant may occasionally work in coordination with or proximity to others. Claimant would be unable to maintain assembly line or production pace employment because of moderate limitations in pace, but maintains the ability to perform work permitting a more flexible pace. Because of moderate difficulties interacting with others, claimant may only engage in brief and superficial contact with the general public. Claimant should experience no more than occasional changes in the work setting."

(R. 25).

Claimant challenges the ALJ's RFC determination on two grounds. First, Claimant argues that the ALJ failed to adequately accommodate her mental limitations and erroneously ignored "the bad days" associated with her anxiety and depression. [ECF No 18] at 10-14. Second, she asserts that the ALJ failed to explain how she accommodated Claimant's headaches and argues that, even had she explained it, the RFC's "limitation to occasional exposure to concentrated levels of vibrations, noise and work in coordination with others" was objectively not enough. [ECF No. 18] at 15-17. The Court addresses Claimant's RFC challenges in turn.

### a.   "Waxing and Waning" Symptoms of Claimant's Depression and Anxiety

To start, the Court disagrees with Claimant's contention that the ALJ supported her RFC determination with only cherry-picked evidence from her "good days" to the exclusion of evidence

that Claimant experienced "bad days" that made it impossible for her to hold a job. The ALJ fairly evaluated all of Claimant's mental limitations in this case and ultimately built a logical bridge between her assessment of the Claimant's mental limitations and the accommodations contained in the RFC, as explained below.

The RFC is a measure of what an individual can do despite the limitations imposed by her impairments. 20 C.F.R. § 404.1545(a). It is "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities," *Id*., and must be supported by substantial evidence. *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000). "As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt*, 758 F.3d at 857. An "ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). However, it is also true that "an ALJ need not mention every piece of evidence, so long as [she] builds a logical bridge from the evidence to [her] conclusion." *Id*. (citing *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)).

The ALJ supported her RFC determination with substantial evidence here. She credited opinions from Claimant's primary care physician, her psychiatrist, and two state agency consultants before ultimately concluding that Claimant's mental limitations as a whole were not work preclusive. (R. 25-30). The ALJ explained that she understood Claimant's symptoms "waxed and waned," but noted that she incorporated limitations into the RFC that accommodated both the "good days and bad days." (R. 29). Even on the bad days, the ALJ opined that Claimant's condition was not "worse" than that set out in the RFC. (R. 29). In support of this conclusion, she noted that

during the relevant period, Claimant's symptoms, including crying spells, sleep disturbances, and panic attacks, were well-controlled with medication when Claimant was consistently taking it as prescribed. (R. 27). The ALJ also relied heavily on records from Claimant's primary care physician, Dr. Joshi, and her psychiatrist, Dr. Gandhiraj, that suggested Claimant's affect and mental limitations were steadily improving over time, (R. 27-28), to the point where Dr. Gandhiraj noted that her panic disorder and major depressive disorder were in full remission at the end of 2016. (R. 27).

Although Claimant did experience some recurring symptoms, the ALJ concluded that, on balance, Claimant's anxiety and depression could be accommodated by eliminating certain stressors that negatively impacted the severity of Claimant's condition. For example, Dr. Joshi explained, in a letter that Claimant suffers from anxiety and depression and that "[s]udden, unexpected, or perceived stressful incidences provoke patient's anxiety." (R. 780). These triggers are consistent with Dr. Joshi's treatment records, which noted that Claimant's "anxiety is well controlled" but that "[p]ersonal and social situations often triggered the symptoms to get worse." (R. 751). He explained that Claimant's "day-to-day activities" were not disrupted by her anxiety disorder – presumably taking into account not only Claimant's good days, but the bad days as well – and that her symptoms were "well controlled with anxiolytic medications." (R. 751). Similarly, Dr. Gandhiraj often associated an increase or decrease in her symptoms with particular life stressors. (R. 819) (Claimant "reports doing okay with her mood. Is slowly recovering from the loss of her sibling but has problems with sleep maintenance. "); (R. 671) ("Pt reports feeling stable with her mood. Is able to cope with things better especially with her son's condition. Sleep and appetite are better. Better energy level and concentration."); (R. 620) (Claimant's "mood has been

14

stable. Appetite is fine. Energy level and concentration are fair. No feelings of hopelessness and worthlessness. Issues with her grandchildren have been resolved.").

Claimant essentially asks this Court to interpret the Seventh Circuit's line of cases in *Punzio, Larson,* and *Bauer* as foreclosing a finding that a claimant can work if the claimant exhibits symptoms of depression or anxiety that "wax and wane." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). But the Seventh Circuit's decision in each of the above cases was based on a fact-intensive inquiry into the particular needs of each individual claimant and what limitations were supported by the record evidence in those cases. For example, in *Punzio,* the Seventh Circuit found clear evidence of error where the ALJ, despite being faced with a record replete with disabling symptoms of bipolar disorder, depression, and attention-deficit disorder, instead relied on a single treatment note "as evidence that Punzio enjoys a few 'good days'" and may therefore hold a job. 630 F.3d at 710. In *Larson,* the Seventh Circuit expressed concern not with the premise that "waxing and waning" symptoms may depend on particular situational stressors, but that there was no record evidence or doctor who so opined in that case. 615 F.3d at 751. Yet here, Claimant did little to apply the general case principles articulated in *Punzio, Larson,* and *Bauer* – namely, that it is often the nature of chronic disease and mental illness that there will be better days and worse days – to Claimant's own particular limitations and the record evidence presented to the ALJ in this case. Instead, Claimant simply repeats a list of the subjective symptoms she says preclude her from working without explaining *how* they affect her ability to perform jobs consistent with the RFC. [ECF No. 18] at 10 ("at times claimant experienced crying jags and restlessness"); [ECF No. 18] at 11 (Claimant's "affect was often flat and she experienced restlessness, agitation, crying jags, social withdraw [sic], low energy, and was unable to socialize,

eat, or work."); *Id.* (Even when Claimant was "doing better," she "still had a restrictive affect, problems sleeping and crying spells."). And as stated above, the ALJ did account for these symptoms in the RFC, to the extent she found them credible and supported by medical and other evidence.

Finally, Claimant summarily asserts that Claimant's mental RFC did not incorporate the complete opinion of Dr. Rozenfeld, one of two state agency consultants in this case. Specifically, Claimant says that the ALJ failed to consider Dr. Rozenfeld's conclusion that Claimant has mild difficulties maintaining social functioning. [ECF No. 18] at 13. This argument has no traction. The ALJ directly credited Dr. Rozenfeld's opinion that "claimant would have mild limitations in…social functioning" and that Claimant was "moderately limited to interact appropriately with the general public." (R. 25). She "found this opinion consistent with the totality of the evidence" and stated that she would "provide[] for [this] limitation[] in the residual functional capacity." (R. 25). She in fact did so when she concluded that Claimant had a *higher* degree of limitation than that advanced by Claimant here – moderate limitations interacting with others – and restricted Claimant to "brief and superficial contact with the general public" and only occasional work "in coordination with or proximity to others." (R. 24-25). It therefore cannot follow that the ALJ failed to account for a lesser limitation by ultimately incorporating a greater one.

### b. Claimant's Headaches

The ALJ also formed a clear and logical bridge between the record evidence and the accommodations she included in the RFC for Claimant's headaches. The ALJ explained that Claimant's headaches could be accommodated in a work setting by "tak[ing] her problems associated with noise as well as vibrations, as well as her reported stress with change and with dealing with others at time[s] into account and therefore limit[ing] her in those areas in order to

avoid triggers and circumstances that increase her pain in the work setting." (R. 26). In doing so, she specifically considered the relevant evidence of Claimant's daily activities, the timing and duration of her headaches, and the measures taken to treat the headaches as required – and as elaborated upon below. *See* 20 C.F.R. § 404.1529(c); S.S.R. 96–7p, 1996 WL 374186, at *3.

In evaluating Claimant's activities of daily living and the causes and effects of Claimant's headaches, the ALJ noted that Claimant reported that her headaches were brought on by "thinking and worrying," her depression, when people yell at her, and by loud noises. (R. 26, 412). Dr. Ghandiraj similarly noted that Claimant's headaches were "[t]riggered by stress and inadequate sleep." (R. 703); (R. 702) (Claimant "states she notices [the headaches] after she has not had adequate rest at night or something is bothering her and she is under tension."). By limiting Claimant to "no more than occasional exposure to concentrated levels of vibrations or noise," "simple work of a routine type [with] normal workplace breaks," and "no more than occasional changes in the work setting," the ALJ therefore specifically targeted the triggers Claimant herself identified: noise, complicated tasks that might require "thinking or worrying," and stress.

Regarding the timing and duration of Claimant's headaches, the ALJ contrasted Claimant's description of her migraines – five days a week, lasting 4-5 hours a day – with the evidence of record, which showed that Claimant almost never complained of headaches at her medical visits during the relevant period. (R. 26). The ALJ also considered that when Claimant did report headaches to her medical providers, she did so with inconsistent frequency. (R. 26) ("In her headache questionnaire to SSA concerning her disability, dated March 1, 2015, claimant reported having headaches three times a week (Exhibit B12E). However, when seen on July 13, 2015, the claimant reported she only has approximately 1-2 episodes a month which last 2-3 days. Claimant was given Imitrix to treat her headaches (Exhibit 8F/18). In March 2016, claimant told her doctor

she had 2 migraines a week (Exhibit B11F/5) and though she continued to complain of headaches she never had an increase in or aggressive treatment, i.e. claimant did not have shots or see a headache specialist."). The ALJ was entitled to consider the discrepancies in Claimant's subjective symptom statements when evaluating what weight ultimately to give her testimony – and to what degree the limitations associated with her headaches needed to be incorporated into the RFC.

Claimant points to several medical treater notes in 2016 and 2017 where she reported daily headaches as evidence that the ALJ failed to accommodate the severity of her limitations. [ECF No. 18] at 16 (citing R. 832, 833, 834, 838, 849). But these notes post-date the relevant period in this case of June 14, 2013 through Claimant's date last insured of December 31, 2015. Indeed, during the relevant period, there appears to be only two medical notes where Claimant report headaches of any kind to her doctors or social workers. (R. 640) (8/12/14); (R. 702) (7/13/15). This is in stark contrast to the numerous medical visits where Claimant reported experiencing "no headache[s]." (R. 477) (8/27/14); (R. 474) (7/2/14); (R. 471) (6/18/14); (R. 493) (4/30/14); (R. 507) (10/9/14); (R. 520) (7/27/14); (R. 528) (6/5/14); (R. 543) (1/11/14); (R. 554) (12/15/13); (R. 567) (10/21/13); (R. 570) (9/29/13); (R. 572) (9/8/13).

In sum, although Claimant characterizes the ALJ's assessment as cherry-picking only facts favorable to the ALJ's view, it was, in fact, Claimant who presented only evidence favorable to her position on this point while ignoring the overwhelming record evidence as to the frequency and severity of Claimant's headaches. As described above, the ALJ addressed Claimant's headaches in the RFC, though she admittedly did not assign the significance to them that Claimant would prefer when she did not find them work-preclusive. And if reasonable minds could differ, the Court defers to the ALJ's judgment and weighing of the evidence. *See Zoch v. Saul,* 981 F.3d 597, 602 (7th Cir. 2020). Therefore, because the ALJ supported her conclusion with substantial

evidence and built a logical bridge between the evidence and her conclusion, her ultimate determination will stand.

### III.    The ALJ's Assessment of Opinion and Subjective Symptom Evidence

Finally, Claimant argues that the ALJ improperly weighed two pieces of evidence: documents completed by Claimant's social worker, Ms. Schaffer, and Claimant's own subjective symptom testimony. Both arguments are unavailing.

#### a.    Claimant's Social Worker, Ms. Shaffer, and the Section 404.1527(c) Checklist

Turning first to Ms. Shaffer, Claimant suggests that the ALJ improperly weighed Ms. Shaffer's opinion[7] by not explicitly "addressing the checklist of factors" in 20 C.F.R. § 404.1527(c). [ECF No. 18] at 14-16. Those factors include the length of treatment, the nature and extent of the treatment relationship, the supportability of the medical opinion, the consistency of the opinion with the record as a whole the physician's degree of specialization, other factors which tend to support or contradict the opinion. Essentially, Claimant argues that Ms. Shaffer's opinion constituted a "medical opinion" under the regulations and that the ALJ reversibly erred by not engaging in a more fulsome discussion of the above factors before affording mixed weight to Ms. Shaffer's third-party statement and no weight to her letter. But this argument misapprehends Ms. Shaffer's status under the regulations and what level of explanation the ALJ must provide when weighing a social worker's opinion.

The regulations specifically provide two different frameworks for the evaluation of "medical opinions" and opinions from "medical sources who are not acceptable medical sources," regardless of whether those sources "treated" the claimant. 20 C.F.R. § 404.1527. And Ms. Shaffer

---

[7] Ms. Shaffer's opinion consisted of a third-party statement dated October 21, 2014 and a letter dated April 21, 2017. (R. 28). The ALJ also reviewed Ms. Shaffer's notes, as did this Court. *See generally* (R. 498-586, 592-614, 615-685, 716-732).

is not an acceptable medical source, given that she is a mental health counselor, not a physician or psychologist. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a) (providing that acceptable medical sources include licensed physicians and psychologists); SSR 06-3p, 2006 WL 2329939, at *1–2 (Aug. 9, 2006).[8] Therefore, although the factors outlined in Section 404.1527(c)(1)–(c)(6) should be considered and may aid the ALJ in determining what weight to give an unacceptable medical source, the regulations do not insist on the same rigorous explanation as would be required for the opinion of a licensed psychologist. Instead, the ALJ need only generally explain the weight given to an unacceptable medical source opinion, or otherwise ensure that his or her discussion of the evidence allows a subsequent reviewer to follow his or her reasoning. 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2); 20 C.F.R. § 404.1527(f).

Here, the ALJ adequately articulated her reasons for affording Ms. Shaffer's third-party statement and letter "mixed weight" and "no weight," respectively. (R. 28). She credited Ms. Shaffer's third-party statement as a useful summary of Claimant's symptoms, but nevertheless explained that it should be afforded mixed-weight because it was almost entirely based on Claimant's self-reports and was internally inconsistent as to the frequency of treatment Claimant

---

[8] Although SSR 06–03p was somewhat recently rescinded, the SSA has specified that the recission is only effective for claims filed on or after March 27, 2017. The recission therefore does not affect SSR 06-03p's applicability to Claimant in this case.

SSR 06-03p previously advised ALJs to evaluate the opinions of non-acceptable medical sources by looking at how long the source has known and how frequently the source has seen the individual, how consistent the opinion is with other evidence, the degree to which the source presents relevant evidence to support an opinion, how well the source explains the opinion, whether the source has a specialty or area of expertise related to the individual's impairment, and any other factors that tend to support the opinion. The ruling also states that "[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as…and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."

needed to address the severity of symptoms described. (R. 28). As to Ms. Shaffer's letter, the ALJ noted that it should be given no weight because it was duplicative not only of the third-party statement described above, but also of Claimant's subjective symptom reports in a record already replete with such information. And finally, although Ms. Shaffer did generally opine that "[C]laimant's symptoms of anxiety and depression as well as reported medical condition impact her ability to function," (R. 28), Ms. Shaffer is not, because of her status as a mental health counselor, an acceptable source for diagnosis under the regulations. Nor can she assess any functional limitations on the part of Claimant on which the ALJ can rely.

In sum, the ALJ explained her reasoning well enough to satisfy 20 C.F.R. § 404.1527(f) and this Court and therefore did not err in ascribing mixed and no weight to Ms. Shaffer's opinions.

### b. Claimant's Subjective Symptom Reports

Claimant also takes issue with the ALJ's conclusion that "her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 26); [ECF No. 18] at 18-20. An ALJ's evaluation of a claimant's subjective symptom statements will be upheld unless it is "patently wrong." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019); *Murphy v. Colvin,* 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support."). "SSR 96–7p provides a two-step test for adjudicators to follow when evaluating a claimant's symptoms such as pain." *Maske v. Astrue*, 2012 WL 1988442, at *11 (N.D. Ill. 2010). First, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96–7p., 61 Fed. Reg. at 34484. Second, if there is such an impairment, "the adjudicator must evaluate the intensity, persistence, and limiting effects of the

individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id*. at 34485. The ALJ must justify his or her subjective symptom evaluation with "specific reasons supported by the record," *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013), and in doing so, must consider several factors, including the objective medical evidence, the claimant's daily activities, his level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, *7-8 (Oct. 25, 2017).

Claimant testified that she was, essentially, completely disabled as a result of mental and physical limitations – and particularly as a result of the symptoms of her anxiety and depression. After the ALJ summarized Claimant's subjective symptom testimony about her physical limitations and migraines, (R. 26), her anxiety and resulting panic attacks, (R. 27), and the symptoms of her depression, (R. 27-28), the ALJ turned to the two-step process required by SSR 96–7p. First, she considered the extent to which the objective medical evidence supported the severity, duration, and frequency of Claimant's subjective complaints and pain. SSR 16-3p, 2017 WL 5180304, at *5 ("[O]bjective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms."). The ALJ in this case emphasized that her credibility determination was heavily based on her review of the objective medical evidence, which she ultimately concluded did not corroborate Claimant's subjective symptom statements. SSR 16-3p, 2017 WL 5180304, at *5 ("[O]bjective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms."). Specifically, the ALJ relied upon reports and notes from Claimant's treating physician, Dr. Joshi, that showed Claimant's self-reported inability to sit longer than 20 minutes, lift more than a pound, or walk further than one block were inconsistent

with the objective medical record – which documented a normal range of motion in Claimant's hips, knees, ankles, and cervical and lumbar spine. (R, 26-27). Dr. Joshi further made note of the fact that, contrary to Claimant's restrictive testimony that she could walk no more than one block, Claimant walked one to two times a week. (R. 26).

The ALJ similarly pointed to records from Claimant's psychiatrist Dr. Gandhiraj, two state-agency consultants, and Claimant's social worker Ms. Shaffer (though these documents were afforded mixed weight) that showed Claimant's testimony was inconsistent with the objective medical record regarding her mental limitations. (R. 26-28). For example, although Claimant testified that she was essentially immobilized by the symptoms of her anxiety and depression, her medical records show that she steadily improved through the relevant period and consistently had fair or good energy levels and concentration and well-controlled anxiety symptoms. (R. 27-28). Within a year of the close of the relevant period in this case, Dr. Gandhiraj even concluded that Claimant's panic disorder without agoraphobia and major depression recurrent were in full remission. (R. 27-28). Because there is no presumption of truthfulness for a claimant's subjective complaints, an ALJ is entitled to rely – as the ALJ did here – on medical opinions based on objective observations as one factor in evaluating the veracity of a claimant's statements. *Rice*, 384 F.3d at 371.

Beyond just the objective medical evidence, the ALJ also briefly discussed some of Claimant's daily activities that she felt were incongruous with the severity of symptoms alleged. For example, despite her limitations, Claimant was able to go to temple three times a week, visit with her son who resides in a mental facility, and make plans to travel to Louisiana with her family to celebrate a holiday. (R. 24, 25-28); *Adams v. Astrue*, 880 F. Supp. 2d 895, 907 (N.D. Ill. 2012) (the ALJ properly considered the claimant's daily activities, which included performing household

chores and using public transportation, in determining the extent of Claimant's alleged symptoms); *Ortega v. Berryhill*, 2018 WL 4144636, at *5 (N.D. Ill. 2018) ("Nevertheless, it was permissible for the ALJ to generally consider how Plaintiff's ability to travel would undermine his credibility."); see also, 20 C.F.R. § 404.1529(c)(3)(i) (explaining that other evidence, including daily activities, is an "important indicator of the intensity and persistence of [claimants] symptoms."). Claimant also testified that she buys groceries at the store with her daughter, (R. 50), and that she does some laundry, albeit not very much because she doesn't know how. (R. 52). She also explained that her son separates her medication into a box labeled Monday through Friday, but that she is able to remember to take those pills after that. (R. 54). The ALJ took note of these activities, (R. 24), and reasonably concluded that, on balance, the above-described activities of daily living undercut Plaintiff's own subjective testimony about her symptoms and impairments. *Burmester*, 920 F.3d at 510 ("The ALJ did not equate Burmester's ability to perform certain activities of daily living with an ability to work full time. Instead, he used her reported activities to assess the credibility of her statements concerning the intensity, persistence, or limiting effects of her symptoms consistent with the applicable rules.").

Similarly, the ALJ pointed to Claimant's course of treatment, including her medication, as another factor supporting her credibility determination. For example, the ALJ noted that despite the severity of Claimant's subjective complaints, Claimant's "treatment has never been increased," "she was never hospitalized," and her therapy appointments remained every two weeks. (R. 28, 30). So too did the ALJ express that Claimant's subjective symptom reports were inconsistent with evidence in the record that when Claimant was "compliant with psychotropic medication" in 2013 and 2014 – the bulk of the relevant period here – she was "doing better and had less crying spells and anxiety symptoms," and "[h]er energy level and concentration were also better." (R. 27). These

factors – medication and treatment – are specifically contemplated 20 C.F.R. § 404.1529(c) and also helped the ALJ build a logical bridge between the evidence and her conclusion that Claimant's testimony was not entirely credible.

Ultimately, the ALJ was required to explain her subjective symptom evaluation "in such a way that allows [the Court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (internal quotations omitted). She did so here, particularly given credibility determinations are due special deference as factual findings. *Scheck*, 357 F.3d at 703; *see also, Matthews v. Saul,* 833 F. App'x 432, 438 (7th Cir. 2020). Claimant offers no meaningful reason the ALJ's credibility determination should not be upheld, nor does this Court believe the ALJ was patently wrong in her assessment in this case. Unlike this Court, the ALJ "had the opportunity to observe the claimant testifying, and, as Justice Jackson rightly observed more than a half-century ago, 'a few minutes observation…in the courtroom is more informing than reams of cold record.'" *Brenda L. v. Saul*, 392 F. Supp. 3d 858, 864 (N.D. Ill. 2019) (quoting *Ashcraft v. State of Tenn.,* 322 U.S. 143, 171 (1944) (Jackson, J., dissenting)).

On a final note, Claimant vaguely takes issue with the ALJ's use of the boilerplate "not entirely consistent" language. But the ALJ's fulsome explanation for how Claimant's statements were weighed renders the use of this oft-criticized language benign here. *Clemente A. v. Saul*, 2019 WL 3973117, at *3 (N.D. Ill. 2019) (collecting cases; noting that the Seventh Circuit has upheld similar boilerplate language so long as ALJ's decision is fully explained) *see also, Fanta*, 2021 WL 961647, at *3. The ALJ considered all Claimant's subjective allegations but nevertheless determined that while Claimant's medically determinable impairments "could reasonably be expected to cause the alleged symptoms," (R. 26), Claimant's allegations of disability were

incompatible with the medical evidence in the record, Claimant's activities of daily living, and her course of treatment and medication. These were sufficient reasons to discount Claimant's testimony.

## CONCLUSION

For the reasons discussed above, Claimant's Motion for Summary Judgment [ECF No. 18] is denied and the Commissioner's Motion [ECF No. 25] is granted.

It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated:    April 8, 2021